BEATTY v. GUGGENHEIM EXPLORATION CO. et al.   (No. 7213.)

(Supreme Court, Appellate Division, First Department.   June 4, 1915.)

1. CORPORATIONS ⬤⟞315—OFFICERS—INDIVIDUAL INTEREST—GOOD FAITH.

Plaintiff, the assistant consulting engineer and general manager of an exploration company, employed under a contract requiring his exclusive services and providing that he should not, except as expressly permitted, directly or indirectly examine, investigate, or report upon any mining properties except for his employer, and that he should not, directly or indirectly, be interested with any person engaged in similar business or owning or operating such property, and allowing him to invest his personal money in corporations promoted by the employer, and who agreed with another engineer, whom the company had specially employed, that he would furnish part of the initial payment on options on property which they had both recommended to the company, and which property was afterwards repurchased from them by its owner and acquired by the company, on the understanding that, if his contract prevented his engaging in such enterprise, it should be treated as a loan to the other engineer, did not thereby breach his duty of good faith toward his principal.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1399, 1400; Dec. Dig. ⬤⟞315.]

2. CORPORATIONS ⬤⟞315—OFFICERS—RATIFICATION OF ACTS.

In such case the action of the company's directors, on the ground that such services had resulted favorably to the company, in voting plaintiff an option to purchase treasury shares of its stock below the market price, was a ratification of plaintiff's action in advancing money, estopping the company from claiming that such act was adverse to its interest.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1399, 1400; Dec. Dig. ⬤⟞315.]

3. CORPORATIONS ⬤⟞314—OFFICERS—MUTUAL DUTIES—GOOD FAITH.

Plaintiff, the assistant general manager and consulting engineer of an exploration company, employed under a contract requiring him to devote his services exclusively to the company's affairs, and forbidding him to become directly or indirectly interested in or connected with any person engaged in any similar business, who induced another engineer, employed by the company without agreement as to his compensation, which was later fixed at 4 per cent. of the shares of the stock of the company, to hold certain acquired mining property, and a further option to purchase an additional 4 per cent. of such shares, and an option to purchase a percentage of the stock of another projected company, and, in consideration of aid extended by him to such other engineer in obtaining an option on property afterwards acquired by the company, agreed that he should receive 1¼ per cent. of the free stock which agreement, though not the particular proportion, was known to the officers of the company, was not guilty of such bad faith towards or secret profit from the company's business as would defeat his action against the company and such other engineer to recover the agreed proportion of free stock.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1393–1398, 1400; Dec. Dig. ⬤⟞314.]

Ingraham, P. J., and McLaughlin, J., dissenting.

Appeal from Trial Term, New York County.

Action by Alfred Chester Beatty against the Guggenheim Exploration Company and another. From a judgment in favor of defendant corporation, entered after a trial, plaintiff appeals. Reversed, and judgment ordered for plaintiff.

⬤⟞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and HOTCHKISS, JJ.

Wollman & Wollman, of New York City (Charles F. Brown, Henry Wollman, and Robert C. Beatty, all of New York City, of counsel), for appellant.

Guggenheimer, Untermyer & Marshall, of New York City (Louis Marshall and John N. Steele, both of New York City, of counsel), for respondent Guggenheim Exploration Co.

Emil Goldmark, of New York City, for respondent Perry.

SCOTT, J. This action was originally brought against the defendant Oscar B. Perry to recover certain moneys, shares of stock, and options to purchase stocks, which said Perry had received from the defendant corporation as compensation for services rendered to it, and of which he had agreed to deliver to plaintiff a part. The defendant corporation claims that it should recover the moneys, stock, and options which plaintiff claims. Perry stands indifferent between these two, being content to make payment and delivery to whomsoever may be entitled thereto. The case involves no novel or abstruse questions of law, and but little dispute as to the material facts. What we really have to pass upon is the application of well-established rules of law to a somewhat unusual state of facts.

The Guggenheim Exploration Company, hereinafter termed the Company, is a corporation engaged in acquiring and developing mining properties. During the times covered by the transactions out of which this action arose it was a very compact organization, although carrying on large enterprises, involving very considerable sums of money. A majority of its directors were members of the Guggenheim family, Daniel Guggenheim being president and executive head of the Company. Mr. John Hays Hammond was also a director, as well as general manager.

The plaintiff, a mining engineer, was assistant general manager and assistant consulting engineer. He was employed by the defendant corporation under a written contract drawn with great care and precision. He was required to perform such duties as he might be called upon to perform by the Company, and especially to visit such places and perform such services in any part of the world as the officers of the Company might from time to time designate. He was required to devote himself exclusively to the discharge of his duties to the Company, and not to accept or enter upon any other business or employment whatsoever, except as otherwise specified in the contract. The exceptions are stated in great detail, but are not relevant to any question involved in this appeal. Then followed a general restriction upon the right of plaintiff to engage professionally as engineer, or to become interested as a stockholder in certain classes of securities. This provision, constituting the third general clause of the contract, originally read as follows:

"It is an essential condition of this agreement that the manager will not at any time during the term hereof, except as hereby expressly permitted, directly or indirectly examine, investigate, advise, consult, or report upon

any mining, smelting, or refining property, works, business, or proposition, or with respect to any business of like character, or permit his name to be affixed to or used in connection with any such property, business, or proposition, except for the Company, and that he will not be or become directly or indirectly interested in or connected with any person, partnership, or corporation engaged in any such or similar business, or owning or operating any such property, either as principal, agent, employé, officer, director, or stockholder in any such business or company: Provided, however, that this shall not be construed to prevent the manager from retaining shares now held by him in any companies the name of which is herewith disclosed to the company by a letter of even date herewith, nor from purchasing in the open market the stocks of any company, the securities of which are now, but not hereafter, listed upon the regular lists of the London and New York Stock Exchanges: Provided, further, that he may invest his personal moneys in the shares or securities of the Company, or of any corporations which are or shall be promoted by, or whose stocks or securities shall be sold or dealt in by, the Company; but the manager shall not have the right to perform services for any of such companies, nor shall he have any duties or occupation whatever, except as in this agreement specifically set forth."

This clause was modified more than once; the proviso as to investments by the manager (plaintiff) being modified on February 26, 1903, so as to read as follows:

"Provided, however, that this shall not be construed to prevent the manager from retaining shares now held by him in any company the name of which is herewith disclosed to the company by a letter of even date herewith, nor from purchasing in the open market the stocks of any company the securities of which are now quoted upon the regular lists of the London and New York Stock Exchanges, but this shall not include any stocks or securities not now, but which may hereafter be, dealt in and quoted on said Exchanges: And provided, further, that he may invest his personal moneys in the shares or securities of the Company, or of any corporations which are or shall be promoted by, or whose stocks or securities shall be sold or dealt in by, the Company; but the manager shall not have the right to perform services for any of such companies, nor shall he have any duties or occupations whatever, except as in this agreement specifically set forth."

This clause assumes some importance in the case because of the claim put forward by the respondent that it was violated in certain particulars by the plaintiff. In the year 1905 the defendant corporation had under consideration a proposition to acquire certain mining rights in the Yukon district in Alaska. These properties had been brought to its attention by one Treadgold, from whom the Company had taken options to purchase. The defendant Perry, an engineer having an office in San Francisco, was sent to examine the properties under an arrangement which left his compensation to be agreed upon thereafter. Perry's reports were so favorable that plaintiff was directed to proceed to Alaska, also to examine the properties. The result was that both Perry and plaintiff advised the acquisition of the properties then under option, as well as certain outlying properties not then under option. The officers of the Company were not satisfied to accept the terms offered by Treadgold, and refused to complete the purchase upon those terms, expressing the desire, however, before finally abandoning the project, that Treadgold, Perry, and plaintiff should come to New York to discuss the matter further.

Among the outlying properties not under option to the defendant Company were certain claims known as "89–104 Below Discovery—

Bonanza Creek." Treadgold was in a position to secure options on these claims, and was greatly in need of ready money to meet certain obligations, which he had hoped to meet from moneys to be paid by the Company, if it had exercised its option on the larger proposition. Perry and plaintiff were of the opinion that, if the Company finally decided to exercise its options and acquire the properties it then had under consideration, it would be greatly to its advantage also to acquire the claims 89–104 Below Discovery. It had no option on these, however, and unless these properties were in some way secured or tied up there was imminent danger that they would be acquired by other interests. Perry was also of opinion that, even if the Company finally decided not to exercise its option and acquire the properties it was then considering, still the claims 89–104 Below Discovery might be profitably developed by themselves as a small enterprise. He therefore arranged to acquire from Treadgold options upon these claims, for which he agreed to pay $45,000 by October 1, 1905, and not less than $115,-000 by May 1, 1906. With this money Treadgold was to secure the claims for Perry's account. Treadgold, however, retained the right to repurchase the claims from Perry by repayment of the money advanced and a certain proportion of the preferred and common stock of any company which might acquire the claims. Perry was not financially in a position to provide the whole amount of the initial payment of $45,000 to Treadgold, so plaintiff, who shared in Perry's valuation of the property, agreed to advance and did advance $35,000 of the amount. Plaintiff seems to have been in some doubt whether the Company would consider it violative of his contract of employment if he became a partner or coadventurer with Perry in the purchase of these properties, so it was agreed between him and Perry that he should share in the enterprise unless the Company objected to his doing so, but if it did object that his contribution of $35,000 should be deemed as a loan to Perry.

On December 5, 1905, in New York, Treadgold came to an agreement with the defendant Company for the acquisition of the properties held or controlled by him, including the claims 89–104 Below Discovery, as to which he had exercised the right to repurchase from Perry, repaying him the $45,000 advanced. Perry has repaid to plaintiff $7,-700 of the amount advanced by the latter, leaving due to plaintiff in any event $27,300, now held by Perry awaiting the outcome of this action, and the recovery of which is part of the relief sought herein, and the only part which he has been permitted to recover.

At the same time that the contract was made with Treadgold, the Exploration Company made a contract with Perry, engaging his services for two years as manager of the Yukon properties, and providing for his compensation for his services in examining and reporting upon these properties and assisting in their acquisition. The amount of this compensation was entirely a matter of negotiation, as he had no contract with the Company covering these services, and could exact no more than the Company was willing to pay. This compensation was fixed at 4 per cent. of the shares of the common and preferred stock of a company to be formed to take over the Yukon properties, and an

option to purchase an additional 4 per cent. of such shares, and a further option to purchase 2 per cent. of the stock of another projected company, to be known as the Northwest Hydraulic Mining Company. The compensation was testified to by the officers of the Company, and was found by the court, to have been "fair and reasonable." Before Perry had concluded the agreement as to his compensation, he and plaintiff had a conversation, or several conversations, in which it was agreed that, in consideration of the aid which plaintiff had extended to Perry, he (plaintiff) should share in Perry's compensation, and there is no doubt that Perry would have been satisfied with a less amount of "free" stock, if he had not intended to give some part of it to plaintiff. He also would have been content with options to purchase a less amount of stock, because he was not sure that he would be able to take and pay for so much as was allotted to him. After Perry's agreement with the Company was reached, it was agreed between him and plaintiff that plaintiff should receive 1¼ per cent. of the free stock, and Perry retain 2¾ per cent., and of the options to purchase stock plaintiff should receive 3 per cent. and Perry retain 1 per cent. In the meantime Treadgold, out of the cash which he received from the Exploration Company, paid Perry $45,000, apparently in lieu of the stock which he had agreed to secure to. Perry, but which could not be issued because of the sale to the Exploration Company. Of this sum, representing the profit arising out of the purchase by Perry, with the assistance of plaintiff, of options upon the claims 89–104 Below Discovery, Perry proposed to pay to plaintiff $27,300. For this sum plaintiff has been refused a judgment, and Perry has been directed to pay it to the Exploration Company.

[1] The respondent Company relies upon, and has argued with much elaboration, two principles of law which are so well established that they require no argument. . These are that a person holding such relations as plaintiff held to the Company owes to his employer the utmost good faith, and that an agent may not secretly make and retain any profit directly or indirectly flowing from business intrusted to him by his principal. The first breach of faith charged against plaintiff is that he joined with Perry in the agreement to acquire from Treadgold options upon the claims 89–104 Below Discovery. It is not argued, or even suggested, that Perry was guilty of any wrongdoing or breach of faith in seeking to acquire these properties, and it is apparent that he was not. He was not at the time a general employé of the Company, and his employment extended only to an examination and report upon properties other than those above mentioned. He was of the opinion that these claims would be valuable to the Company in connection with the larger properties, if the Company finally decided to undertake it, and he also concluded that the claims might be profitably developed by themselves if the Company decided not to embark in the larger scheme. How it would decide was still uncertain, and there was imminent danger that rival interests might acquire the claims if some action was not taken regarding them. So he decided, and as the event proved decided wisely, to secure the claims himself, to be saved to the Company if it decided to embark in the contemplated enterprise, but to be retained

and developed by Perry himself if the Company did not wish to acquire them.

[2] Plaintiff's part in the enterprise was to advance some of the necessary money, and he was careful to have it thoroughly agreed that his advances should be treated solely as a loan to Perry, if it should be found that he (plaintiff) could not under his contract embark in the enterprise of developing the claims as a business enterprise. Up to this point I am quite unable to see that plaintiff committed any fault. If Perry had a right to contract with Treadgold for an option on the claims, certainly no wrongdoing can be attached to plaintiff for having loaned him money to use. That the Company did not consider in 1906 that plaintiff had acted adversely to its interests in advancing money to secure the claim is best evidenced by the fact that the directors, in consideration of the services he had rendered in that particular, and expressly because those services had resulted favorably to the Company, voted to give him an option to purchase 180 shares of the stock, then in the treasury unissued, at a price below the market price. This, as it seems to me, is a most emphatic approval and indorsement and ratification of plaintiff's action in advancing the $35,000 to Perry, and completely estops the Company from attributing that act as one of treachery to its interests.

[3] If plaintiff was guiltless of wrongdoing in advancing the money to Perry, his fault, if he committed one, must be found in inducing Perry to share the compensation which he was to receive from the Company. Ordinarily Perry, having been accorded certain stocks and options to buy stock as compensation for his services, would be entitled to dispose of them as he saw fit, unless forbidden to do so by some provision of his contract. There is no such provision, however, and consequently Perry was at liberty to deal as he would with the stocks and options, unless there was something in plaintiff's relations to the Company which rendered it improper that any part of such stocks and options should go to him alone out of all the world. Much is made in this connection of the restrictions embraced in the contract between plaintiff and the Company as to his investment in the stocks of other corporations. By that contract, however, as amended by the agreement of February 26, 1903, it was expressly "provided, further, that he [plaintiff] may invest his personal moneys in the shares or securities of the Company, or of any corporations which are or shall be promoted by, or whose stocks or securities shall be sold or dealt in by, the Company." The obligation to notify the president before investing in securities was added to the original contract between plaintiff and the Company by an agreement dated March 4, 1904, and expressly had reference only to securities as to which the original contract had absolutely forbidden plaintiff to buy, and had no reference whatever to securities of the defendant corporation, or of corporations promoted by it, as to which he had the right from the beginning to invest at will.

Finally it is said that defendant was ignorant, when it agreed upon the compensation to be given to Perry, that he intended to give any part of it to plaintiff, and that Perry asked for higher compensation

than he would otherwise have done because he had agreed to give part of it to plaintiff. That the same officers who agreed with Perry upon his compensation knew at the time that Perry professed to give a part of it to plaintiff is certain. Hammond, director, general manager, and chief engineer, testifies explicitly that he knew it, and Daniel Guggenheim, the Company's president and chief witness upon the trial, testified as follows:

"He [Hammond] told me—he said to me at one time that Mr. Beatty wants to get some of the stock, or wishes to get some of the stock, that was allotted to Mr. Perry, and whether I would have any objection to his getting any of that stock. I told Mr. Hammond that I did not object, but that he should be very careful and see that Mr. Beatty did not take too much of Mr. Perry's stock, and told him that I did not think that Mr. Beatty needed a guardian, but I thought perhaps Perry did."

It is said, also, that Perry would have been satisfied with a smaller compensation if he had not intended to share with plaintiff, and so Perry testified. The significance of this evidence is not apparent. Perry and the Company were dealing absolutely at arm's length. He had no contract with it as to his compensation, and was in no position to insist on any particular compensation, but must be satisfied with what it was willing to give, and the compensation finally awarded to him was regarded by the officers of the Company and has been found by the court to have been "very fair."

The case we have, then, is that plaintiff advanced moneys to secure options upon property which would in all probability have been lost to the Company if he had not advanced the money. His action in this regard was clearly to the advantage, and not to the. disadvantage, of the Company, and was so recognized by the Company by its act, by formal resolution, of granting an option to purchase stock in express recognition of the value of his services in this regard. So far as concerns his agreement with Perry to receive a portion of the latter's compensation for services, it clearly appears, from the evidence of the Company's president and the general manager, who fixed the compensation to be given to Perry, that they knew perfectly well at the time that Perry proposed to give some part of his compensation to plaintiff. They probably did not know just what proportion, and apparently were not interested to inquire; their chief anxiety being, for Perry's sake, that he should not give away too much.

In all this we are unable to discern on plaintiff's part any bad faith, violation of confidence, or breach of confidence, nor is there a trace of any attempt on his part to keep secret from the Company his action in aiding Perry to secure options upon the claims, or his agreement with Perry as to sharing his compensation. If any fault could be attributed to plaintiff, and we do not say it could, it would have been in joining with Perry in purchasing the option to the claims 89–104 Below Discovery. But in advancing money for that purpose he was careful to have it agreed that he should be committed to nothing contrary to his contract with the Company, and his part in that action was not only disclosed to the Company, but was distinctly recognized by it as a benefit, as it undoubtedly proved to be.

After a most careful examination of the evidence and the briefs,

we are unable to find legal justification for the judgment appealed from, which must accordingly be reversed, with costs, and a judgment entered in favor of the plaintiff, with costs and an allowance of $2,000 as against the Exploration Company. Order to be entered on notice, at which time the findings to be reversed and the new findings to be made will be settled and the precise amount of the recovery determined.

Judgment reversed, with costs, and judgment ordered in favor of plaintiff as indicated in opinion, with costs and allowance as against the Exploration Company. Settle order on notice.

CLARKE and HOTCHKISS, JJ., concur.

McLAUGHLIN, J. (dissenting). I am unable to agree with a majority of the court that the judgment appealed from should be reversed, and judgment directed in favor of the plaintiff; on the contrary, I think the judgment should be affirmed.

Under the contract, and its several modifications, which the plaintiff had with the defendant Exploration Company, he was absolutely prohibited, without the written consent of such company, signed by its president or vice president, from acquiring, when he did, an interest in the option taken by Perry to purchase claims 89–104 Below Discovery, Bonanza Creek. After the execution of the contract and the several modifications, the plaintiff, while in the employ of the Exploration Company, acquired from time to time various mining interests, and in each instance, except the one under consideration, asked for and received the company's consent. An intimation is made in the prevailing opinion that such consent was not required in the instance under consideration by reason of the amendment of February 26, 1903. I do not think the contract is susceptible of this construction. It is not the construction put upon it by the plaintiff himself, because, when he acquired the interest, according to his own testimony, he was very careful to have it understood, if the Company did object, then the amount of money advanced to Perry was to be considered as a loan. It is not the construction put upon it by plaintiff's counsel on the appeal, because he concedes in the brief presented "that the terms of the contract between the plaintiff and the defendant company restrained him" (plaintiff) "from entering into the arrangement made with Perry," and in this connection he urges that the consent was subsequently given. The trial court found it was not given, and I think there is sufficient evidence to sustain the finding. It certainly cannot be said to be against the weight of evidence. Viewing the evidence in the most favorable light to the plaintiff, all that can be claimed from it is that Hammond, the general superintendent, and Daniel Guggenheim, the president, of the company, knew that after the settlement was made with Perry he was going to let the plaintiff have a portion of his stock and option. The evidence does not show, as I read the record, that the company, or any of its officers or directors, knew that the plaintiff was interested with Perry in the enterprise other than as above indicated.

Nearly a year after the plaintiff acquired his interest with Perry he suggested, by reason of the fact that he had made a loan to Perry

which enabled him to acquire options on the claims, he was entitled to some recognition by the Company. The suggestion was acted upon, and the Company permitted him to purchase 180 shares of its stock at a price which enabled him to make a profit of about $20,000. This was upon the theory that he had made simply a loan to Perry and was not otherwise personally interested in the enterprise. It is quite improbable that, had the Company known at the time he was interested with Perry, and when a settlement was made with him plaintiff would receive, by virtue of his interest, the large amount of profits he is here seeking to recover, it would then, in effect, have made him a present of $20,000. When Perry came to settle with the Company, the terms agreed upon were largely in excess of what he would otherwise have demanded and been satisfied with, were it not for the fact that he had, under his arrangement with plaintiff, to let him have a large proportion of what he received. Perry so testified. This fact, prior to the settlement, was not communicated to the Company, any of its officers, or Hammond. In this connection, Hammond's testimony is quite significant. He stated that, had he known of that fact, he would have suggested that both the plaintiff and Perry be "fired out of the office."

It is suggested, not by counsel, that the fact that Perry demanded and received more than he would have been satisfied with, had the plaintiff not been interested with him, is of no importance, since Perry and the company dealt at arm's length. I am unable to appreciate the suggestion. Honesty and fair dealing require a different standard. Perry was entitled to receive from the company a fair compensation for the services rendered by him, and this is all to which he was entitled. This is what the Company supposed it was paying him when the settlement was made, but he knew such was not the case. That he was subsequently to let plaintiff have some of the interest received is a different proposition from his fixing his compensation, because of that fact, at an amount largely in excess of what he knew he was entitled to. He could, of course, after the stock or option to purchase had been given to him, if he had received only that to which he was entitled, he being under no contract with the Company, sell it to the plaintiff, or give it to him, if he so desired. A fair consideration of the entire testimony of Daniel Guggenheim shows this is what he had in mind when he testified, referring to a conversation with Hammond:

"He said to me at one time that Mr. Beatty wants to get some of the stock, or wishes to get some of the stock, that was allotted to Mr. Perry, and whether I would have any objection to his getting any of that stock. I told Mr. Hammond that I did not object."

The plaintiff violated his contract when he entered into the agreement with Perry to advance $35,000 and share in the profits realized. Such violation precluded him from receiving any of such profits. This conclusion is not changed simply because he told Hammond that he had an interest in Perry's claim, or that Perry was going to let him have some of the stock and option allotted to him, and Hammond, in turn, told the same to the president of the Exploration Company. As stated by Sir George Jessel in Dunn v. English, L. R. 18 Eq. 524:

"It is not enough for the agent to tell the principal that he is going to have an interest in the purchase, or to have a part in the purchase. He must tell him all the material facts. He must make a full disclosure."

See, also, McKinley v. Williams, 74 Fed. 94, 20 C. C. A. 312; Imperial Mercantile Credit Ass'n v. Coleman, L. R. 6 H. L. 189; 2 Pomeroy's Eq. Jur. (3d Ed.) §§ 956, 957, 959.

The plaintiff has been awarded by the judgment appealed from a recovery for the amount of money advanced to Perry, less what has since been paid thereon, together with interest. This is all to which I think he is entitled. The Company was entitled to his services, uninfluenced by the expectation of any reward other than that furnished by the contract. He was obligated under the contract, before he acquired any interest in the arrangement with Perry, to make a full disclosure to his principal and obtain its consent to his receiving what he claimed. To permit the plaintiff to recover in this action, outside of what he had been awarded, is, it seems to me, to destroy one of the most salutary rules which has been adopted to prevent an agent making a secret profit out of his position. "It is," said Lord Justice Rigby in Costa Rica Co. v. Forwood [1901] Ch. Div. 760, referring to Aberdeen R. R. Co. v. Blaikie, "a rule of universal application that no trustee shall be allowed to enter into engagements in which he has, or can have, a personal interest conflicting, or which may possibly conflict, with the interest of those whom he is bound by fiduciary duty to protect. So strictly is this principle adhered to that no question is allowed to be raised as to the fairness or unfairness of the transaction, for it is enough that the parties interested object." See, also, Goodell v. Hurlburt, 5 App. Div. 77, 38 N. Y. Supp. 749.

After a careful consideration of the record, I am unable to reach any conclusion other than that the plaintiff deliberately violated his contract when he entered into the agreement with Perry; that the Exploration Company never knew that he had an interest in that agreement, and never consented, with knowledge of that fact, that he should receive a portion of the compensation paid to Perry.

The judgment should be affirmed.

INGRAHAM, P. J. (dissenting). I concur with Mr. Justice McLAUGHLIN in his dissent. The plaintiff was employed by the defendant under a written agreement which carefully prescribed his duties in relation to the defendant corporation, and agreed that he would—

"during said period devote himself exclusively to the discharge of such duties, and will not during said term accept, engage in, or enter upon any other business or employment whatsoever except as hereinafter specified."

It further provided that it was an essential condition of the agreement that the manager would not at any time during the term thereof, except as thereby expressly permitted, directly or indirectly examine, investigate, advise, consult, or report upon any mining, smelting, or refining property, works, business, or proposition, or with respect to any business of like character, that he would not be or become interested in or connected with any person, partnership, or corporation engaged in any such or similar business, or owning or operating any

such property, either as principal, agent, employé, officer, director, or stockholder in any such business or company. And he further expressly agreed that:

"No covenant, condition, or provision of this agreement can or shall for any purpose be waived, altered, modified, or amended, unless the same be in writing subscribed by the parties hereto, and they hereby covenant that they will not urge or claim any such waiver, alteration, modification, or amendment unless the same be evidenced by such writing."

Now the plaintiff entered into this contract, receiving a large salary, fully understanding its purport, and while the contract was in force, and he was acting for the corporation in relation to this Alaska property, he became interested in the purchase of property, the purchase of which was being considered by his employer, under an agreement that he was to have a share in the profits of the purchase of the mining claims. I do not understand it to be seriously disputed that he would not be entitled to this share of the profits realized from the subsequent sale of the mining claims to the defendant corporation his employer unless he received the authorization from his employer which was contemplated by this contract. He never received such authorization in writing, and therefore under the terms of the contract he was not entitled to receive any share of the profits realized on the subsequent sale of the mining claims to the defendant corporation.

But it is claimed that the corporation waived this provision in the contract, and that, as I understand it, is the basis upon which the plaintiff claims the right to receive this share of the profits. But, assuming that the officers of the defendant had knowledge at some time after the purchase of these mining claims by the defendant Perry that the plaintiff was to receive a share of the profits, I can see no justification for any claim of waiver arising from that knowledge. It is not pretended that the plaintiff did anything after the so-called waiver. He advanced nothing on the faith of it. He expressly agreed that there should be no waiver, except in writing, signed by the parties to the original agreement, and no such writing was ever executed. I can see no reason why the terms of such an agreement should not be enforced, or, where a party expressly agrees that there shall be no waiver, except in writing, why he should be allowed to prevent the enforcement of his contract because of a verbal waiver, or one implied from facts, when no question of estoppel is presented, and where the party has not been induced to enter into a transaction by some act of the other party which would make it inequitable or estop the other party from insisting upon the original agreement. It seems to me a clear case of an agent, having bound himself by the most stringent provision to be faithful and honest in his relations to his principal, attempting to procure an advantage in a transaction in which he represented his principal, and where his principal relied upon the faithful discharge of the obligation that the agent assumed.

I therefore concur in my Brother McLAUGHLIN'S opinion.